UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EMERSON D. WARE,

       Petitioner,

v.                                        Case NO. 8:12-CV-578-T-27AEP

SECRETARY, DEPARTMENT
OF CORRECTIONS,

       Respondent.
_____/

## ORDER

Petitioner, an inmate in the Florida Department of Corrections proceeding *pro se*, initiated this action by filing a petition for writ of habeas corpus under 28 U.S.C.§ 2254 (Dkt. 1). He challenges his convictions for first degree murder, armed burglary of a dwelling, and aggravated assault, entered in the Twelfth Judicial Circuit, Manatee County, Florida, in 2006. Upon review, the petition must be denied.

## PROCEDURAL HISTORY

Petitioner was charged with one count of first degree murder (count one), one count of armed burglary of a dwelling (count two), and two counts of aggravated assault (counts three and four). (Dkt. 12, Ex. 18, Vol. I, at pp. 44-48.) A jury convicted Petitioner of counts one, two, and four, and found him not guilty of count three. (*Id.*, at pp. 130-31.) He was sentenced to consecutive terms of life imprisonment on counts one and two and a concurrent term of five years' imprisonment on count four. (*Id.*, at pp. 133-142.) The state appellate court *per curiam* affirmed his convictions and sentences. (Dkt. 12, Ex. 4.) Petitioner filed a state habeas petition alleging ineffective assistance

of appellate counsel, which the state court appellate court denied.  (Dkt. 12, Exs. 6, 7.)  Petitioner

filed a motion and an amended motion for postconviction relief under Florida Rule of Criminal

Procedure 3.850.  (Dkt. 12, Exs. 8, 9.)  The state court considered these motions together and

summarily denied them.  (Dkt. 12, Ex. 10.)  The state appellate court *per curiam* affirmed the order

of denial. (Dkt. 12, Ex. 14.)  Petitioner timely[1] filed his federal habeas petition on March 15, 2012.

Respondent filed a response (Dkt. 9) and Petitioner filed a reply (Dkt. 16).

## STANDARD OF REVIEW

**Standard of Review for Petitions Subject to AEDPA**

This petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act

("AEDPA") effective April 24, 1996.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).  Habeas

relief can only be granted if a petitioner is in custody "in violation of the Constitution or laws or

treaties of the United States."  28 U.S.C. § 2254(a).  Section 2254(d) sets forth a highly deferential

standard for federal court review of a state court's findings of law and fact.  It provides that habeas

relief may not be granted on a claim adjudicated on the merits in state court unless such

determination:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

The Supreme Court has explained this deferential standard:

---

[1] In the response, Respondent fails to address the timeliness of the federal habeas petition.  The petition is timely in accordance with 28 U.S.C. § 2244(d).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Additionally, "the focus ... is on whether the state court's application of clearly established federal law is objectively unreasonable ... an unreasonable application is different from an incorrect one."  *Bell v. Cone*, 535 U.S. 685, 694 (2002).  *See Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that [the federal court is] to decide.").  The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state court decision."  *Williams*, 529 U.S. at 412.

The purpose of federal review is not to re-try the case.  "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell*, 535 U.S. at 693.  In other words, "AEDPA prevents defendants–and federal courts–from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."  *Renico v. Lett*, 130 S.Ct. 1855, 1866 (2010).

A state court's factual findings must also be given deference, and a petitioner bears the burden of overcoming a state court's factual determination by clear and convincing evidence.  Specifically, a state court's determinations of fact "shall be presumed to be correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Henderson v. Campbell*, 353 F.3d 880, 890-91 (11th Cir. 2003).

**Exhaustion of State Remedies and Procedural Default**

Before a district court can grant habeas relief to a state prisoner under § 2254, the petitioner must exhaust all state court remedies that are available for challenging his conviction, either on direct appeal or in a state postconviction motion. *See* § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). *See also Henderson*, 353 F.3d at 891 ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.") (citations omitted). A state prisoner "'must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (quoting *O'Sullivan*, 526 U.S. at 845).

To exhaust a claim, a petitioner must make the state court aware of both the legal and factual bases for his claim. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass on and correct alleged violations of its prisoners' federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)). A federal habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State ... if he has the right under the law of the State to raise, by any available procedure, the question presented." *Pruitt*, 348 F.3d at 1358. The prohibition against raising an unexhausted claim in federal court extends to both the broad legal theory of relief and the specific factual contention that supports relief. *Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004).

The requirement of exhausting state remedies as a prerequisite to federal review is satisfied if the petitioner "fairly presents" his claim in each appropriate state court and alerts that court to the federal nature of the claim. 28 U.S.C. § 2254(b)(1); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). A petitioner may raise a federal claim in state court "by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such claim on federal grounds, or simply by labeling the claim 'federal.'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F. 3d 695, 703 (11th Cir. 1999). *See also Murray v. Carrier*, 477 U.S. 478 (1986). To show prejudice, a petitioner must demonstrate not only that the errors at his trial created the possibility of prejudice but that they worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimensions. *United States v. Frady*, 456 U.S. 152 (1982). The petitioner must show at least a reasonable probability of a different outcome. *Henderson*, 353 F.3d at 892; *Crawford v. Head*, 311 F.3d 1288, 1327-28 (11th Cir. 2002).

Alternatively, a petitioner may obtain federal habeas review of a procedurally defaulted claim if review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Carrier*, 477 U.S. at 495-96. A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of

someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson*, 353 F.3d at 892. This exception requires a petitioner's "actual" innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001). To meet this standard, a petitioner must show a reasonable likelihood of acquittal absent the constitutional error. *Schlup*, 513 U.S. at 327.

**Standard of Review for Claims of Ineffective Assistance of Counsel**

Claims of ineffective assistance of counsel are reviewed under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To obtain relief under *Strickland*, a petitioner must show that counsel's performance was deficient and that this deficiency prejudiced the petitioner. *Id.* at 687. In order to show deficient performance, a petitioner must demonstrate that "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Counsel is presumed to have provided effective assistance. *See id.* at 689-90. Further, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. Sustaining a claim of ineffective assistance of counsel is difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citations omitted). If a court can dispose of a claim of ineffective assistance of counsel on one prong of the *Strickland* test, the court need not consider the other prong. *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).

**DISCUSSION**

Ground One: "WHETHER PETITIONER'S PRE AND POST *MIRANDA* STATEMENTS WERE INVOLUNTARILY OR UNLAWFULLY ELICITED? OR; ALTERNATIVELY, WHETHER THE DECISION OF THE TRIAL COURT REFUSING TO SUPPRESS PETITIONER'S STATEMENTS WAS CONTRARY TO, OR INVOLVED AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED FEDERAL LAW, AS DETERMINED IN *MIRANDA*?"

Petitioner was convicted of first degree murder in the May 9, 2004 stabbing death of his ex-girlfriend, Jeanette Conwell.  Petitioner made incriminating statements both prior to and after receiving warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1996).  He moved to suppress these statements, arguing that they were obtained in violation of his Fifth Amendment rights.  Specifically, Petitioner moved to suppress his pre-*Miranda* statements, which concerned his involvement and the location of a knife, on the basis that they were made during the functional equivalent of custodial interrogation.  Petitioner's post-*Miranda* statements included an admission that he stabbed Conwell with a knife he took from her house, as well as additional statements about his involvement, the events prior to the murder, and his lack of intent to kill Conwell.  He moved to suppress these statements on the basis that he invoked his right to remain silent before making them. After conducting an evidentiary hearing, the state trial court denied Petitioner's motion.  The state appellate court rejected Petitioner's claim that this denial was erroneous.

(1)    Testimony Presented at Hearing on Petitioner's Motion to Suppress

      (a)    Testimony of Detective Lieutenant Davis

Police located Petitioner at a motel in Sarasota, Florida, on the day of the murder.  Detective Lieutenant Keith Davis testified that when he knocked on the motel room door, it opened and he saw Petitioner. (Dkt. 12, Ex. 18, Vol. II, at pp. 12-13.)  Davis testified that, "I told him that he knew why we were here." (*Id.*, at p. 13.)  Petitioner lowered his head.  (*Id.*)  Davis testified that members of

the media had arrived at this time and were positioning a vehicle and cameras at the motel entrance. (*Id.*, at p. 14.)

Davis placed Petitioner on the bed inside the room. (*Id.*) He testified that Petitioner's head was hung and it seemed as if he was "giving up." (*Id.*) Davis's testimony indicated that he told Petitioner, in an attempt to console him, that he knew Petitioner had a drug problem. (*Id.*, at p. 15.) Davis testified that, in response, Petitioner stated that was not why he did it, and started to cry. (*Id.*)

The police were aware that a knife or sharp object had likely been used in the murder. (*Id.*, at p. 16.) Another detective in the motel room asked Davis whether he should search for the knife. (*Id.*, at pp. 15-16.) This question was directed at Davis. (*Id.*, at p. 16.) Petitioner responded to the statement first, saying that it was not in the room. (*Id.*) Davis responded directly to the other detective and told him to start searching. (*Id.*, at pp. 16-17.) Petitioner then stated that it was out at the historical place on 15th Street. (*Id.*, at p. 17.)[2]

Petitioner was taken to a police car parked in the motel parking lot. Davis testified that he read Petitioner his *Miranda* warnings from a card while Petitioner was inside the parked car. (*Id.*, at pp. 17-19.) At this time, Davis testified, Petitioner still appeared to be emotional. (*Id.*, at p. 19.) Additionally, several officers and detectives were present, and members of the media were located at the entrance of the motel. (*Id.*) Davis testified that Petitioner appeared to be uncomfortable with this activity. (*Id.*) After he gave Petitioner *Miranda* warnings, Davis asked Petitioner whether, having these rights in mind, Petitioner wished to talk to them now. (*Id.*, at p. 18.) In response, he testified, Petitioner "made a comment that he didn't want to say any more right now." (*Id.*) Davis

---

[2]A historical park was located close to the murder scene. A knife was recovered from the park. (Dkt. 12, Ex. 18, Vol. 2, at pp. 10, 20-21.)

was certain that Petitioner included the words "right now" in his response. (*Id.*, at pp. 18, 31.) Davis

stopped speaking to Petitioner at that time. (*Id.*, at pp. 19, 32.)

      (b)    <u>Testimony of Sergeant Wilkinson</u>

      Sergeant James Wilkinson, along with Detective Michael Skoumal, began an interview with

Petitioner at the police station about thirty minutes after Davis talked with Petitioner in the police

car. (*Id.*, at p. 36.) This interview was tape recorded, and portions of the tape were played during

the hearing. The interview began with Wilkinson reminding Petitioner that he had been read

*Miranda* warnings and asking him if he understood those rights. Wilkinson testified, after listening

to this portion of the tape, that Petitioner nodded his head at that time. (*Id.*, at p. 38.)[3] Wilkinson also

testified that when Petitioner was asked if, having those rights in mind, he wanted to talk, Petitioner

nodded his head and started speaking about the offense. (*Id.*, at p. 44.)[4] At the end of the police

---

[3]The transcript of the recording, which was introduced into evidence at the hearing, reflects the following:

WILKINSON:    Mr. Ware, Lieutenant Davis had spoke with you out at the hotel just a little while ago, the dark-haired guy. Okay. He read you a Miranda card advising you of your rights. Did you understand those rights that he explained to you?

SKOUMAL:    You have to say yes or no because they can't pick up.

WARE:    Trying to pick up. Yeah.

(Dkt. 12, Ex. 18, Vol. X, at p. 3.)

[4]This portion of the transcript provides:

WILKINSON:    Okay. Having those rights in mind, would you like to talk to us about what, what occurred this morning, whether it was an accident or what? We just, we just need to know, and we'd like to talk to you about it.

WARE:    It wasn't intent to, to kill her.

WILKINSON:    Okay.

WARE:    It was no intent to (inaudible).

(Dkt. 12, Ex. 18, Vol. X, at p. 3.)

interview, Petitioner said he did not want to talk.[5]  Wilkinson told the court that Petitioner did not

previously say anything similar.  (*Id.*, at p. 40.)  He also testified that the officers did not discuss the

investigation with Petitioner or question him before turning on the tape recorder.  (*Id.*, at p. 42.)

 (c) <u>Testimony of Petitioner</u>

 Petitioner testified that officers questioned him prior to giving him *Miranda* warnings:

"Asking me where - - where was the knife, tell them what happened, why did I do it, things of that

nature." (*Id.*, at p. 48.)  Petitioner testified that, after Davis gave him *Miranda* warnings, he said he

did not want to talk and did not equivocate in any way.  (*Id.*, at p. 48, 53-54.)  Petitioner further

testified that, at the police department, he was not re-advised of *Miranda*, did not want to initiate any

conversation, and did not get the impression that he had any choice whether to speak with police.

(*Id.*, at p. 49.)  Petitioner testified that the officers asked him questions before they started recording

the interview.  (*Id.*)  He also testified that he did not nod his head when asked if he wanted to speak.

(*Id.*, at p. 50.)

 However, on cross-examination, Petitioner testified that he could not recall the statements

made by Davis or the other detective at the motel, and did not recall making incriminating statements

---

[5]The transcript of the interview concludes as follows:

WILKINSON: See if she would take you back? Once you got inside her place of work - -

WARE: I don't want to talk (inaudible).

WILKINSON: You don't want to talk anymore?

WARE: No, sir.

WILKINSON: All right.  The time is 1750 hours.

(END OF STATEMENT.)

(Dkt. 18-1, at dkt. pp. 1-2.)

there.  (*Id.,* at pp. 50-53.)  He stated that he did not recall Davis reading him his rights at all.  (*Id.*, at pp. 53-54.)  Petitioner testified that at the police station, he did not recall Wilkinson reminding him that he had been read his *Miranda* warnings, that he did not know if it was his voice on the tape that was played during the hearing, and that he did not remember anything about the police department.  (*Id.*, at pp. 54-55.)  Petitioner agreed that he could not testify that he was coerced or pressured by the police because he did not remember anything.  (*Id.*, at p. 55.)  He also did not recall responding with a statement about his lack of intent to kill Conwell when asked if he wanted to talk.  (*Id*., at pp. 55-56.)

(2)     Petitioner's Pre-*Miranda* Statements in the Motel Room

The state court rejected Petitioner's argument that his pre-*Miranda* statements made in the motel room were impermissibly obtained during the functional equivalent of custodial interrogation:

> On May 9, 2004, law enforcement went to the Cadillac Motel in Sarasota to attempt to locate Mr. Ware, the apparent suspect in the death of Ms. Conwell.  The evidence established that Detective Davis, with the Bradenton Police Department, knocked on the motel room door and when the Defendant opened the door Detective Davis introduced himself and stated, "You know why we are here."  At that time, the Defendant lowered his head, and a bit later started to cry.  The Court finds that such observations of Det. Davis regarding the Defendant's non-verbal conduct does not violated his Fifth Amendment right and is admissible in this cause.
>
> A short time later, after the Defendant had been handcuffed, but while still in the motel room, in an effort, according to Det. Davis, to build a rapport between the two, the detective said, "I know you have a drug problem".  The Defendant responded, "that's not why I did it, the bitch did me wrong" and began to cry.  This Court will find that, while the Defendant was clearly in custody, the Detective's statement, not seeking an answer or a response, was not questioning or interrogation, in violation of his right to remain silent.  Said another way, the Detective's statement to the Defendant, "I know you have a drug problem" could not objectively be considered a request for information or response from the Defendant, but was merely an effort to build a rapport with the Defendant such that there would less likely be any problems encountered during the arrest process.  His effort to commiserate with the Defendant was not the functional equivalent of questioning and not reasonably

likely to elicit an incriminating response and, therefore, the response to the Detective's statement, "that's not why I did it" is admissible, subject to a 90.403 argument and analysis to be made at a later time.

Moments after the above-referenced exchange, while the Defendant is still handcuffed and sitting on the bed and just prior to him being removed from the room, an officer accompanying Detective Davis asked Davis if he should search the motel room for the knife, the purported murder weapon. Prior to the [sic] Davis being able to respond, the Defendant stated, "it's not in the room". When Davis nevertheless directed the assisting officer to begin searching, the Defendant said that the weapon was "out at the historical place". Such a brief conversation in front of the Defendant by the two law enforcement officers was not the functional equivalent of questioning and there was not a reasonable likelihood here that the assisting officer's question to Det. Davis would elicit an incriminating response by the Defendant. The police here, in discussing investigative protocol, certainly could not have reasonably expected the Defendant to make such an admission. It is clear from the record that their brief conversation was, indeed, merely a dialogue between two officers that happened to have occurred in the Defendant's presence. There was no questioning here, and, as indicated, their words could not have reasonably been expected to elicit an incriminating response. As such, the defense Motion to Suppress the statements regarding the location of the knife are denied.

(Dkt. 12, Ex. 18, Vol. IX, at pp. 222-23.)

The record supports the state court's conclusions. The Fifth Amendment states that "[n]o

person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const.

amend. V. *Miranda* provides that the prosecution "may not use statements, whether exculpatory or

inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use

of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at

444. Accordingly, if a person in custody is subject to interrogation, he must be informed that he has

the right to remain silent. *Id.* at 467-68. *Miranda* warnings must be given to a suspect who is

subject to questioning or its functional equivalent:

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express

questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Rhode Island v. Innis*, 446 U.S. 291, 300-302 (1980) (footnotes omitted) (emphasis original).

The record reflects that, in the motel room, Petitioner was in custody but was not provided *Miranda* warnings. However, the record supports the state court's conclusion that Petitioner was not subject to the functional equivalent of questioning at the time he made incriminating statements. Accordingly, law enforcement was not required to provide *Miranda* warnings to Petitioner, and his statements were not improperly obtained.

To the extent that there were conflicts in the evidentiary hearing testimony, the state court implicitly credited Davis's testimony over that of Petitioner in making its findings. A state court's credibility determinations are presumed to be correct and must be given deference in federal habeas proceedings. *See Baldwin v. Johnson*, 152 F.3d 1304, 1316 (11th Cir. 1998) ("We must accept the state court's credibility determination and thus credit [the attorney's] testimony over" that of the petitioner.); *Devier v. Zant,* 3 F.3d 1445, 1456 (11th Cir. 1993) ("Findings by the state court concerning historical facts and assessments of witness credibility are ... entitled to the same presumption according findings of fact under 28 U.S.C. § 2254(d).").

The court relied on Davis's testimony in finding that his comments to Petitioner were part of an attempt to make a connection with him so as to minimize the risk of problems during the arrest. Davis's comment, "I know you have a drug problem" was not a question, did not seek information from Petitioner, and did not refer to the murder or other crimes. Consequently, as the state court determined, there is no basis to find that Davis should have known his remark was reasonably likely to elicit an incriminating response.

The record also supports the state court's conclusion that Petitioner's comments about the location of the knife were not improperly obtained. In *Innis*, a suspect was arrested following a report that a man with a sawed-off shotgun robbed a taxi driver. Officers driving the suspect in a police vehicle discussed the nearby location of a school and the danger of a child potentially finding the shotgun. *Innis*, 446 U.S. at 294-95. The suspect offered to reveal the location of the weapon. *Id*. at 295. The Supreme Court held that the officers' discussion was not the functional equivalent of interrogation because there was no evidence to support the conclusion that the officers "should have known that their conversation was reasonably likely to elicit an incriminating response" from the suspect. *Id.* at 302.

The record supports the state court's finding that the officers engaged in a brief discussion concerning investigative protocol in front of Petitioner but did not engage in any questioning, as well as the state court's determination that this conversation did not amount to the functional equivalent of questioning because there is no basis to conclude that the officers should have known their comments were reasonably likely to elicit an incriminating response.[6]

---

[6]Additionally, to the extent Petitioner may be arguing that his *pre-Miranda* statements were involuntary, he presents no evidence to support this claim. His testimony that the police asked him questions in the motel room was not credited by the state court when in making its findings, and he does not present other evidence to indicate his statements in the motel room were anything other than voluntary.

Accordingly, Petitioner does not show that his pre-*Miranda* statements were obtained in violation of his Fifth Amendment rights.   Consequently, he fails to demonstrate that the state appellate court's rejection of his challenge to the denial of his motion to suppress his pre-*Miranda* statements was contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts.

(3)   Petitioner's Post-*Miranda* Statements at the Police Department

Petitioner argues that his statements at the police station were unlawfully or involuntarily obtained because they were made after he invoked his right to remain silent when Davis gave him *Miranda* warnings in the motel parking lot.   The state court rejected this argument:

> The defense also seeks to suppress the taped statement made by the Defendant a short time later at the Sarasota Police Department.   The evidence established that, while in the parking lot of the Cadillac Motel, and while seated in the back of a patrol vehicle, Det. Davis read the Defendant his Miranda warning.   In response to whether or not he wished to make any statements the Defendant replied "I don't want to say anymore right now".   The testimony established that the Defendant was still quite emotional at this time and, additionally, that camera crews were beginning to assemble in the parking lot of the motel.   Approximately thirty minutes after leaving the motel, the Defendant was brought to a small room at the Sarasota Police Department, wherein the taped interview took place.   At the start of the tape, the Defendant is reminded that he was previously read his Miranda warning by Det. Davis.
>
> ...
>
> The central question here is whether the Defendant's statement after being read Miranda while in the parking lot of the motel, "I don't want to say anymore right now" is a sufficient assertion of his right to remain silent to foreclose all subsequent questioning.   This Court finds that it is not.   The Defendant's statement is simply not a sufficiently unequivocal expression of his desire to have all questioning end.   The Defendant's statement does not evidence a clear decision on his part to refuse to make a statement to law enforcement.   Under the circumstances at the time the statement was made, while sitting in the back seat of a patrol vehicle, with camera crews advancing, numerous law enforcement personnel about, and in light of his then emotional condition, the statement more clearly suggests he would prefer not to talk to law enforcement at that particular moment.   It does not, as the defense has suggested, evidence a clear and unequivocal invocation of his Miranda rights.   This

Page 15 of  38

conclusion is particularly highlighted by the fact that at the end of the taped interview the Defendant *very* clearly expresses his desire to cease talking and, at that exact moment, questioning did cease. Based upon the foregoing, this Court will find that the taped statement made by the Defendant at the Sarasota Police Department is admissible in this cause, and the defense Motion to Suppress said tape is DENIED.

The Court should note that even if the words "I don't want to say anything right now" are considered to be a sufficiently unequivocal invocation, pursuant to Globe vs. State, 877 So. 2nd 663 (Fla. 2004), the taped admissions made subsequent to said statement are nevertheless admissible. The Court notes that the Detective did not ask the Defendant any questions after he made the statement in question and that there is no evidence that he was questioned by anyone until he arrived at the Sarasota Police Department. The Court also notes that there was a roughly thirty minute period between the Defendant's statement while in the motel parking lot and the questioning at the police station, that the Defendant was reminded that he had been read his Miranda Warning previously prior to any questioning taking place, and that the second questioning took place at a different location. As indicated above, while this Court does not consider the Defendant's statement, "I don't want to say anything right now", to be a clear and sufficient invocation, pursuant to Globe and Franklin vs. State, 324 So. 2nd 187 (Fla. App. 1st Dist. 1975) the Motion to Suppress the taped statement would nevertheless be DENIND [sic].

(Dkt. 12, Ex. 18, Vol. IX, at pp. 223-25.)

Once a suspect invokes the right to remain silent, questioning must cease. *Miranda*, 384 U.S. at 473–74. However, a suspect's invocation of this right must be made unambiguously and unequivocally. *See Davis v. United States*, 512 U.S. 452, 459 (1994) (stating that a "suspect must unambiguously request counsel."). *Davis*'s rule that a suspect must make an unambiguous request when invoking the right to counsel also applies in the context of invoking the right to remain silent. *See Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010); *Owen v. Fla. Dep't of Corr.,* 686 F.3d 1181, 1192-93 (11th Cir. 2012); *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir. 1994).

"An unequivocal and unambiguous invocation of the right to remain silent is one articulated 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement *to be* a request' to exercise his right to remain silent and terminate the interrogation, not

Page 16 of 38

that it *might be* a request to remain silent.*"* *Owen*, 686 F.3d at 1194 (quoting *Davis*, 512 U.S. at 459) (emphasis in original).  Absent an unequivocal invocation, law enforcement is not obligated to stop questioning.  *See Coleman*, 30 F.3d at 1424 ("A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent.  If the statement is ambiguous or equivocal, then the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation.").

A suspect's right against self-incrimination may be waived if done so "voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444.  Two considerations affect the review of a suspect's waiver of his constitutional rights.  First, the waiver must be voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Second, the waiver must be knowing and intelligent so as to have been "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* The "totality of the circumstances surrounding the interrogation" must demonstrate an uncoerced choice and the requisite level of comprehension. *Id.* However, because "[t]he sole concern of the Fifth Amendment ... is governmental coercion," it follows that "[t]he voluntariness of a waiver of [the Fifth Amendment] privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986).

The record supports the state court's conclusion that Petitioner's statements at the police department were not improperly obtained because, under the circumstances,  he did not clearly and

unambiguously invoke his right to remain silent when read his *Miranda* rights.[7]  To the extent that

Petitioner and Davis provided inconsistent testimony concerning Petitioner's statement, the state

court implicitly made a credibility determination when it found that, consistent with Davis's

testimony, Petitioner said that he did not want to say anymore "right now."   This credibility

determination must be afforded deference.  *See Baldwin*, 152 F.3d at 1316; *Devier*, 3 F.3d at 1456.

Petitioner does not point to any evidence aside from his own testimony, which the court did not

credit, that the state court's conclusion was erroneous.

Furthermore, the testimony that the court found credible indicates that, when he was read

*Miranda* warnings inside the police car, Petitioner was still in an emotional state.  A number of law

enforcement officers were in the motel room and on the grounds outside, and media vehicles and

cameras were on site.  It was in this setting that Petitioner told Davis he did not want to say anymore

---

[7]Petitioner appears to argue in his federal habeas petition that the *Miranda* warnings given to him were insufficient.  When he presented this claim in his motion to suppress, the state trial court found that the *Miranda* warnings were "clear, not flawed, and sufficiently advised him as to all of his rights pursuant to" *Miranda*.  (Dkt. 12, Ex. 18, Vol. IX, at p. 224.)

However, Petitioner did not raise this claim on direct appeal.  (Dkt. 12, Ex. 2.)  Accordingly, the claim is unexhausted due to his failure to invoke one full round of the established state review process.  *See Pruitt*, 348 F.3d at 1358-59. Because state procedural rules do not provide for successive direct appeals, his claim is procedurally defaulted. *See Smith*, 256 F.3d at 1138.   Petitioner does not demonstrate that either exception to the procedural default doctrine applies.   Notwithstanding this bar, Petitioner fails to demonstrate entitlement to relief.  At the evidentiary hearing, Detective Davis testified that he read Petitioner the following from a rights advisement form:

> You have the right to remain silent.  Anything you say can and will be used against you in a court of law.  You have the right to talk to a lawyer and have him present with you while you are being questioned.  If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish.  You can decide at any time to exercise these rights and not answer any questions or make any statements.

(Dkt. 12, Ex. 18, Vol. II, at p. 18.)  Petitioner argued before the state trial court that the warnings provided to him were inadequate because they failed to clearly inform him that he had the right to talk to an attorney before any questioning. However, police officers are not required to recite any precise language when giving *Miranda* warnings, so long as they communicate those rights to the suspect.  *Florida v. Powell*, 559 U.S. 50, 60-61 (2010). Here, Petitioner was expressly told that he had the right to talk with an attorney, that an attorney would be appointed to represent him before any questioning, and that he could exercise his rights at any time.  Taken together, these warnings sufficiently relayed to Petitioner that he could speak with an attorney before questioning.  Accordingly, Petitioner does not show that the state court's conclusion was erroneous or that he would be entitled to relief on this claim.

"right now."  Petitioner's language, particularly when considered under these circumstances, indicated that he simply did not wish to talk right then and there, as opposed to not wanting to talk at all.[8]  Moreover, as the state court noted, his comment stood in contrast to his later invocation of his right to remain silent at the end of his police interview, which showed that Petitioner was capable of clearly invoking this right.

Furthermore, Petitioner fails to show that he is entitled to relief on his argument that the record contains no evidence of a voluntary waiver of his right to remain silent.  He appears to allege his comments were improperly elicited by officers during the interview at the police department.[9]  However, Petitioner does not demonstrate that his statements were involuntary. Petitioner does not assert that he did not understand the *Miranda* warnings or the potential consequences of making statements to the police.  When asked whether he wanted to talk, he responded by informing officers of his lack of intent to kill.  He continued to answer questions from the officers concerning the day's events until he chose to cut off questioning at the end of the interview. (Dkt. 12, Ex. 18, Vol. X; Dkt. 18-1, at dkt. pp. 1-2.)  During the hearing, Petitioner conceded that he was unable to offer any testimony about being coerced or pressured to make statements.  Petitioner makes no showing that his statements were involuntary or coerced.[10]  Petitioner fails to demonstrate that the incriminating statements during the police interview were made in violation of his Fifth Amendment rights.

_____

[8]In his federal habeas petition, Petitioner refers to Davis's testimony that, at the time, he construed Petitioner's reply as an indication he was invoking his Fifth Amendment privilege.  However, Petitioner fails to show that Davis's interpretation of or belief about Petitioner's statement when it was made affects the validity of the state court's finding so as to entitle him to federal habeas relief.

[9]Although Petitioner states that he did not sign a written waiver of his rights, this does not establish an involuntary waiver of his right to remain silent.  *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent ... is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver.").

[10]*See Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.").

The record further supports the state court's alternative conclusion that, even assuming Petitioner's statement that he did not want to say anymore right now could have been construed as a clear invocation of his right to remain silent, the statements he made at the police station were not improperly obtained.   A suspect's invocation of his right to remain silent does not necessarily prevent the resumption of questioning in the future.   The Supreme Court considered whether a suspect's invocation of his right to remain silent forecloses all future questioning of the suspect in *Michigan v. Mosley*, 423 U.S. 96 (1975).   That decision provides that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id*. at 104.   In determining that the suspect's right was scrupulously honored and resumed questioning was proper, *Mosley* considered that the initial interrogation stopped immediately upon the suspect's invocation of his right to remain silent, that a significant amount of time passed prior to the resumption of questioning, that the suspect was again read his rights prior to further questioning, and that upon resuming questioning, the suspect was questioned by a different officer about an unrelated crime.   *Id*. at 104-07.   *See also Gore v. Sec'y, Dep't of Corr.*, 492 F.3d 1273, 1297 (11th Cir. 2007).

The record reflects that after Petitioner told Davis that he did not want to say anymore right now, Davis stopped speaking with him.   Petitioner was removed from the scene and taken to the Sarasota Police Department.   There, he was interviewed by two different officers about thirty minutes later.   These officers reminded Petitioner that Davis gave him *Miranda* warnings, and according to Wilkinson's testimony, Petitioner nodded when asked if he recalled the *Miranda* warnings given to him.   The interview transcript also indicates that when asked if he wished to speak to the officers, Petitioner responded by stating that he did not intend to kill Conwell.

Whether a suspect's invocation of his right to remain silent has been scrupulously honored is determined on a case-by-case basis by considering the totality of the circumstances, and the absence of a single factor addressed in *Mosley* is not determinative.  *See Gore*, 492 F.3d at 1298-99. Considering the *Mosley* factors, Petitioner cannot show that, even assuming he previously invoked his right to remain silent, this right was not scrupulously honored or that his subsequent statements were unlawfully procured.  Furthermore, as addressed, Petitioner fails to demonstrate that he did not voluntarily waive his right to remain silent or that his statements were involuntary or coerced.  He does not show that his statements were obtained in violation of his constitutional rights.

Accordingly, Petitioner has not shown that the state appellate court's rejection of his challenge to the denial of his motion to suppress his post-*Miranda* statements was contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts.  He has not demonstrated entitlement to relief on the claims raised in Ground One.

Ground Two: "WHETHER THE TRIAL COURT ERRED IN DENYING THE MOTION FOR JUDGMENT OF ACQUITTAL FOR FIRST DEGREE MURDER WHEN THE STATE FAILED TO PROVE PREMEDITATION BEYOND A REASONABLE DOUBT?"

The state trial court denied Petitioner's motion for judgment of acquittal, in which he asserted that the State failed to present sufficient evidence of premeditation.[11]  The state appellate court affirmed this decision.  Petitioner argues that the trial court erred in denying his motion, and that his conviction violates federal due process because of insufficient evidence showing premeditation.

---

[11]As relevant here, first degree murder is defined as the unlawful killing of a human being when perpetrated from a premeditated design to effect the death of the person killed or any human being.  § 782.04(1)(a)1., Fla. Stat.  At trial, Petitioner maintained that he did not intend to kill Conwell and argued that the State failed to show premeditation.  In arguing the motion for judgment of acquittal, defense counsel asserted that, in the light most favorable to the State, the evidence was sufficient at the most to present the jury with a charge of second degree murder.  (Dkt. 12, Ex. 18, Vol. VII, at p. 602.)

Respondent contends that Petitioner's claim concerns only state law, and that he failed to exhaust this argument when he did not present the issue to the state appellate court as involving federal law.  However, this claim is considered exhausted because the state standard of review for a sufficiency of the evidence claim is identical to the federal standard of review:

> Florida courts assess the sufficiency of the evidence used to convict criminal defendants under a legal standard identical to the one used by federal courts in deciding federal due process challenges to the sufficiency of the evidence ... In this case, the state court analyzed [petitioner]'s due process sufficiency of the evidence claim using a standard identical to the one required under federal law.  Under these circumstances, we conclude [petitioner]'s federal claim has been exhausted.

*Mulnix v. Sec'y, Dep't of Corr.*, 254 Fed. App'x 763, 764-65 (11th Cir. 2007).

The Due Process Clause of the Fourteenth Amendment prohibits a criminal conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime."  *In re Winship*, 397 U.S. 358, 364 (1970).  The Supreme Court established the standard of review in a federal habeas corpus proceeding in which a petitioner challenges the sufficiency of the evidence:

> We hold that in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 – if the settled procedural prerequisites for the claim have otherwise been satisfied – the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 324 (1979).[12]   "[T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt.'" *Id.* at 318-19 (quoting *Woodby v. INS*, 385 U.S. 276, 282 (1966)) (emphasis in original).  "[T]he *Jackson* standard of review is '[e]qually applicable to direct or circumstantial evidence.'" *Martin v.*

---

[12]Florida courts evaluate a sufficiency of the evidence claim under a legal standard identical to the standard used by federal courts in deciding a federal due process challenge to the sufficiency of the evidence.  In evaluating such a claim, Florida courts assess whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt. *Simmons v. State*, 934 So.2d 1100, 1111 (Fla. 2006).

*Alabama*, 730 F.2d 721, 725 (11th Cir. 1984) (quoting *United States v. Wuagneux*, 683 F.2d 1343, 1358 (11th Cir. 1982)).

Sufficiency of the evidence claims are governed by the substantive elements of a criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16. "Although each element of the offense must be established beyond a reasonable doubt, *see Bishop v. Kelso*, 914 F.2d 1468, 1470 (11th Cir. 1990), the State is not required to rule out every hypothesis except that of the guilt of the defendant, *see Jackson*, 443 U.S. at 326." *Johnson v. Alabama*, 256 F.3d 1156, 1172 (11th Cir. 2001). If the record contains facts supporting conflicting inferences, the jury is presumed to have resolved those conflicts in favor of the State and against the defendant. *Id*. Accordingly, federal courts must defer to the judgment of the jury in assigning credibility to witnesses and weighing the evidence. *Id*.

The Florida Supreme Court has defined premeditation as:

> more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as the nature of the act to be committed and the probable result of that act.

*Carpenter v. State*, 785 So.2d 1182, 1196 (Fla. 2001) (quoting *Norton v. State*, 709 So.2d 87, 92 (Fla. 1997)).[13] Premeditation may be established by circumstantial evidence. *Woods v. State*, 733 So.2d 980, 985 (Fla. 1999). "Such evidence of premeditation includes 'the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." *Id*. (quoting *Spencer v. State*, 645 So.2d 377, 381 (Fla. 1994)).

---

[13]The jury in Petitioner's case was instructed in accordance with the standard jury instruction on premeditation. *See* Fla. Std. Jury Instr. (Crim.) 7.2. (Dkt. 12, Ex. 18, Vol. VIII, at p. 686.)

The State presented evidence of premeditation, including evidence indicating that Petitioner was upset with Conwell prior to the murder and armed himself as he attempted to find her on the morning of the murder.   During the early morning hours that day, Petitioner asked a girlfriend, Cynthia Lyons, for a ride to Conwell's house, but Lyons refused.  (Dkt. 12, Ex. 18, Vol. VII, at pp. 527-28.)  Lyons testified that Petitioner had talked to her about Conwell over the past few weeks, saying that Conwell kept calling the police on him and that something needed to be done about her. (*Id.*, at p. 528.)  At about 5:00 a.m. on the day of the murder, Petitioner entered Conwell's house, where her daughter Teneal Manning and Manning's boyfriend Calvin Brown were present.   Once inside, Petitioner took a knife from the kitchen and confronted Manning and Brown in a bedroom. (Dkt. 12, Ex. 18, Vol. V, at pp. 331-38, 345.)  He demanded to know Conwell's location from Manning, who told him Conwell was at work.  (*Id.*, at p. 337.)   Petitioner exited the house and returned to the car he was driving.  His passenger, Angelica Leyva, testified that Petitioner said his girlfriend left him for another man, and made statements such as, "how could she do this, and he wasn't going to be putting up with her shit."  (Dkt. 12, Ex. 18, Vol. VI, at p. 415.)  She stated that Petitioner was "really mad" and was hitting the steering wheel as he drove.  (*Id.*, at pp. 415-16.)  On the way to the nursing home where Conwell was working, Petitioner drove quickly and tailgated a car occupied by two other employees on the way to work, Oralia Brantley and Nelda Peay.  (Dkt. 12, Ex. 18, Vol. VII, at pp. 508-09, 520.)

The State's evidence also reflected, however, that Petitioner presented a calm demeanor, conversed with others, and concealed the knife upon arriving at the nursing home and attempting to gain access inside the facility.  When Brantley confronted Petitioner about his driving, he said that he did not have a problem with her, and was there to see his fiancee. ( Dkt. 12, Ex. 18, Vol. VII, at

p. 521.)  Petitioner pressed a buzzer for several minutes in order to enter the facility. (Dkt. 12, Ex. 18, Vol. VI, at p. 417.)   Tina Cunningham, who opened the door for him along with another employee, testified that he was "very calm" and "very polite," and that he said he wanted to see his fiancee.  (*Id.*, at pp. 398-400.)  Neither Leyva nor the nursing home employees saw Petitioner with a weapon, and he later confessed to police that he had the knife in his pocket.  (*Id.*, at pp. 404, 420; Dkt. 12, Ex. 18, Vol. VII, at p. 515.)[14]

Additionally, the State presented evidence that, once inside the building, Petitioner immediately sought out Conwell and stabbed her.  Petitioner was seen approaching Conwell after he entered the nursing home.  (*Id.*, at p. 522.)  A couple of minutes later, he was observed fleeing while Conwell, bleeding from her side, sought help.  (*Id.*, at pp. 522-23.)  The State presented evidence that Conwell's wounds were indicative of five separate stabbing thrusts.  (Dkt. 12, Ex. 18, Vol. VI at p. 378.)  Conwell's stab wounds included several that were close to or damaged her heart and lungs, and two to her back.  (*Id.*, at pp. 375-76.)  Additionally, the evidence indicates that Petitioner had time to reflect at Conwell's house and as he drove to the nursing home, while he spoke with other employees and waited to enter the facility, and in the course of confronting Conwell.

Viewing this evidence in the light most favorable to the State, a rational trier of fact could find it sufficient to prove premeditation.  Accordingly, Petitioner fails to demonstrate that the state trial court erred in denying his motion for judgment of acquittal and therefore does not show a due process violation based on insufficient evidence to sustain his conviction. Therefore, Petitioner does

---

[14]The trial transcript reflects that, when the tape of the police interview was played, Petitioner's answers to questions from police about where he kept the knife were inaudible to the court reporter.  (Dkt. 12, Ex. 18, Vol. VII, at p. 578.)  However, the previously prepared transcript of this interview clearly reflects Petitioner's statement that he kept the knife in his pocket.  (Dkt. 12, Ex. 18, Vol. X, at p. 16.) The jury listened to the tape and also had the transcript for review.

not show that the appellate court's rejection of his claim was contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts.  Petitioner is not entitled to relief on Ground Two.

Ground Three: "PETITIONER WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE APPELLATE STAGE IN VIOLATION OF HIS RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION."

In Ground Three, Petitioner alleges that appellate counsel was ineffective.  Claims that appellate counsel provided ineffective assistance are analyzed under the two-part test set forth in *Strickland*.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991).  To establish a claim, Petitioner must show that appellate counsel's performance was objectively unreasonable, and that there is a reasonable probability that, but for this performance, Petitioner would have prevailed on his appeal.  *Smith*, 528 U.S. at 285-86.

(1)    Sub-claim A: "Appellate counsel failed to raise the trial court's admission of gruesome photo's [sic] of the victim which created an undue prejudice in the minds of the jury," and Sub-claim B: "Appellate counsel failed to raise the prosecutor's assertion of personal opinion during closing argument."

In sub-claim (A), Petitioner claims that appellate counsel should have argued that the trial court erred by permitting the State to introduce into evidence "gruesome" photographs of the victim. He contends that, because the manner in which Conwell was murdered was not contested, the photographs were not relevant to any issue in dispute.  Petitioner's federal habeas petition does not identify the specific photographs to which he refers.  When he raised this claim in his state habeas petition, Petitioner again failed to identify the photographs, but cited to the portion of the trial transcript where the State introduced crime scene photographs during the testimony of Detective Jim Curulla.  (Dkt. 12, Ex. 6, at p. 3; Dkt. 12, Ex. 18, Vol. V, at pp. 255-57.)  Accordingly, Petitioner's

federal habeas claim is construed to involve the photographs he indirectly referenced in his state habeas petition.  In sub-claim (B), Petitioner asserts that appellate counsel should have argued that, during closing arguments, the prosecutor made an improper comment involving personal opinion.[15] The state appellate court rejected both of these claims when it denied, without comment, Petitioner's state habeas petition.  (Dkt. 12, Ex. 7.)

However, trial counsel indicated he had no objection to the introduction of photographs during the portion of Curulla's testimony cited by Petitioner.  (Dkt. 12, Ex. 18, Vol. V, at pp. 255-58.)[16]  Similarly, counsel did not object to the prosecutorial comment identified by Petitioner.  (Dkt. 12, Ex. 18, Vol. VIII, at p. 643.)  Therefore, neither of these issues was properly preserved for appellate review.  In Florida, a contemporaneous objection is required to preserve an issue for appeal.  "[M]ost trial court errors are subject to the contemporaneous objection rule.  'To preserve error for appellate review, the general rule is a contemporaneous, specific objection must occur during trial at the time of the alleged error.'"  *Jackson v. State*, 983 So.2d 562, 567-68 (Fla. 2008) (quoting *Gore v. State*, 964 So.2d 1257, 1265 (Fla. 2007)).  Specifically, "to preserve an issue regarding the admissibility of evidence, a defendant must make a contemporaneous objection when

---

[15]Petitioner refers to the prosecutor's statement, "And of course, you got the most compelling evidence of all, most compelling evidence you can have in any case, I submit, a voluntary confession."  (Dkt. 12, Ex. 18, Vol. VIII, at p. 643.)

[16]Respondent appears to construe Petitioner's claim as referring to photographs introduced during the testimony of the medical examiner, Dr. Laura Hair.  Petitioner did not refer to Dr. Hair's testimony in either his federal or state habeas petition.  Even assuming these photographs were at issue, however, no objection to their introduction was raised at trial.  Prior to Dr. Hair's testimony, the court and parties addressed the photographs that were to be entered. (Dkt. 12, Ex. 18, Vol. VI, at pp. 362-64.)  Counsel objected to one photograph of the victim's body on the basis that it unnecessarily showed her genitalia, and the photograph was cropped in response to this objection. (*Id.*, at pp. 363-64.) Therefore, counsel's one objection was sustained and the photograph was altered to counsel's satisfaction.  Moreover, during this discussion, counsel specifically stated that he did not have a legal basis to raise other objections to the photographs.  (*Id.*, at p. 363.)  Accordingly, he did not object to the introduction of the photographs when the State presented them during Dr. Hair's testimony.  (*Id.*, at pp. 370-73.)

the evidence is admitted." *Rodriguez v. State*, 919 So.2d 1252, 1286 (Fla. 2005) (citing *Pagan v. State*, 830 So.2d 792, 811 (Fla. 2002)).   A contemporaneous objection is also required to raise a claim of improper prosecutorial comment.  *See Brooks v. State*, 762 So.2d 879, 898 (Fla. 2000); *Allen v. State*, 662 So.2d 323, 328 (Fla. 1995).

Appellate counsel cannot be deemed ineffective for failing to raise issues that were not properly preserved in the trial court, as such a decision is based on the reasonable conclusion that the appellate court will not consider an un-preserved claim on the merits.  *See Diaz v. Sec'y, Dep't of Corr.*, 402 F.3d 1136, 1142 (11th Cir. 2005); *Atkins v. Singletary*, 965 F.2d 952, 957 (11th Cir. 1992); *Francois v. Wainwright*, 741 F.2d 1275, 1285-86 (11th Cir. 1984).  Petitioner provides no basis to conclude that appellate counsel would have believed that these issues would be heard despite the lack of preservation.[17]  Accordingly, Petitioner fails to demonstrate entitlement to relief on sub-claims (A) and (B) of Ground Three because he does not show that the state appellate court's rejection of his claims was contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts.

---

[17]In his federal habeas petition, Petitioner alleges that appellate counsel should have argued that the following prosecutorial comment during closing argument was improper:

> Two, the death was caused by the criminal act of Emerson Ware. [Counsel] in his closing said, well, I can't concede that.  But really I submit implicitly in his argument he did, because he never contested the fact the person responsible is Emerson Ware.  He contested other things, premeditation, other things, but he didn't contest the fact that he's the one that broke into the house.  So clearly the person who is responsible does sit before you today.

(Dkt. 12, Ex. 18, Vol. VIII, at p. 643.)  However, Petitioner did not refer to this statement when he raised his claim of ineffective assistance of appellate counsel in the state court.  (Dkt. 12, Ex. 6.)  Petitioner cannot use his federal habeas petition to argue new facts in support of his ineffective assistance claim, *see Anderson v. Harless*, 459 U.S. 4, 6 (1982), or raise new claims of ineffective assistance.   *See Footman v. Singletary*, 978 F.2d 1207, 1211 (11th Cir. 1992).  Notwithstanding this bar, the record reflects that trial counsel did not object to this comment. (See Dkt. 12, Ex. 18, Vol. VIII, at p. 643.)  Therefore, a claim that this statement constituted impermissible prosecutorial comment was not preserved for appellate review.  For the same reasons addressed here, appellate counsel cannot be deemed ineffective for failing to raise an un-preserved issue on appeal.

(2)    <u>Sub-claim C: "Appellant [sic] counsel was ineffective in failing to raise the prosecutor's</u>
<u>intentional revealing (through his witness) of other crimes or bad acts committed by Petitioner."</u>

Petitioner argues that appellate counsel was ineffective for not arguing that, during the

testimony of Conwell's daughter Teneal Manning, the State revealed evidence of his prior crimes

or bad acts.[18]  When Manning testified about the relationship between Conwell and Petitioner, she

was asked whether Conwell sought an injunction against him:

| | |
|---|---|
| Q: | Now, at some point before May 9th, 2004, did your mom break up with Mr. Ware? |
| A: | Yes. |
| Q: | And about how long was that before May 9th, 2004? |
| A: | Can you repeat the question again? |
| Q: | About how long was it before May 9th, 2004, that she broke up with him? |
| A: | Two weeks. |
| Q: | And did she kick him out of house? |
| A: | Yes. |
| Q: | Did she take some steps to get an injunction against him? |
| A: | Yes. |
| [COUNSEL]: | Judge, I'm going to object.  May we approach? |
| THE COURT: | Okay. |
| ... | |

---

[18]"Evidence of collateral crimes, wrongs, or acts committed by the defendant is admissible if it is relevant to a material fact in issue; such evidence is not admissible where its sole relevance is to prove the character or propensity of the accused."  *Czubak v. State*, 570 So. 2d 925, 928 (Fla. 1990).

[COUNSEL]:        My first objection is he hasn't established that she has personal knowledge, and of course this [is] hearsay. My second objection is specifically as to the evidence of the injunction. I'm objecting to any evidence of an injunction ever being sought out against Mr. Ware as evidence of potential prior bad acts, and it's not admissible.

[STATE]:          I wasn't going to get into her reasons why she sought the injunction. I don't think that an injunction necessarily entails prior violence or prior bad acts. I'm simply trying to establish that he wasn't welcome in the home.

THE COURT:        And how does she know that?

[STATE]:          Well, let me explore.

THE COURT:        Okay.

[COUNSEL]:        Are we going to do that in the jury's presence?

THE COURT:        Obviously, I don't want her to testify to hearsay and I'm not - - I'm eager for her not to testify as to prior incidents of violence.

[STATE]:          You know what? I'll withdraw. I'll withdraw this.

[COUNSEL]:        Judge, may we have a curative instruction?

[STATE]:          Sure.
                  ...

THE COURT:        Ladies and Gentlemen, I'm going to ask that you disregard the last question and answer; the last question of [the State] and the last answer of Ms. Manning.

(Dkt. 12, Ex. 18, Vol. V, at pp. 328-330.) It appears that the prosecutor asked the question believing it to be relevant to the charge of armed burglary of a dwelling. But the question was withdrawn, and the court provided a curative instruction.

Petitioner does not show how appellate counsel was ineffective for failing to argue that evidence of prior bad acts was improperly presented.  Contrary to Petitioner's characterization of the proceedings, no evidence of Petitioner's prior bad acts was presented to the jury.  He therefore cannot show that his proposed claim would have been meritorious so as to result in a different outcome on appeal.  This is especially so given the significant evidence of guilt presented at trial.  On the charge of aggravated assault of Calvin Brown, Brown testified that, while Petitioner held the knife, he directed statements at Brown that caused Brown some degree of fear for his life.  (Dkt. 12, Ex. 18, Vol. VII, at pp. 549-51.)[19]  On the charge of armed burglary of a dwelling, the State presented evidence that Petitioner entered Conwell's home uninvited, that Manning saw him pick up the knife, and that he committed an aggravated assault.  (*Id.*; Dkt. 12, Ex. 18, Vol. V, at pp. 333-36, 345.)[20]

As to the charge of first degree murder, in addition to the evidence discussed in Ground Two, *supra*, the State presented Petitioner's incriminating statements, including his admission to stabbing Conwell, and the testimony of Davis and Wilkinson about the incriminating statements made to them.  (Dkt. 12, Ex. 18, Vol. VI, at pp. 433-36; Dkt. 12, Ex. 18, Vol. VII, at pp. 563-64, 567-79.)  The State also presented Cynthia Lyons's testimony that Petitioner confessed to her that he stabbed Conwell, and testimony that blood found inside the car Petitioner was driving matched Conwell's DNA profile.  (Dkt. 12, Ex. 18, Vol. V, at pp. 308-310; Dkt. 12, Ex. 18, Vol. VI, at pp. 466-67; Dkt. 12, Ex. 18, Vol. VII, at pp. 531.)

---

[19]Assault is defined as "an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent."  § 784.011, Fla. Stat.  Aggravated assault is defined as an assault with a deadly weapon without intent to kill, or with an intent to commit a felony.  § 784.021(1)(a)-(b), Fla. Stat.  Petitioner was convicted of aggravated assault of Brown but found not guilty of aggravated assault of Manning.

[20]As relevant here, armed burglary of a dwelling occurs when an individual unlawfully enters or remains in a dwelling, has the intent to commit an offense therein, and is armed or becomes armed with a dangerous weapon within the dwelling.  *See* § 810.02(1)(b), (2)(b), Fla. Stat.  (Dkt. 12, Ex. 18, Vol. I, at p. 45.)

Given these circumstances, Petitioner has not shown that counsel should have raised this claim on direct appeal or that doing so would have resulted in a different outcome. Appellate counsel is not required to raise every non-frivolous issue on appeal. *Heath*, 941 F.2d at 1130-31. Rather, "effective advocates 'winnow out' weaker arguments" even when such arguments may have merit. *Id.* at 1131. Therefore, appellate counsel may choose to focus on the strongest claims while excluding those that may have a lower chance of success or detract from more viable arguments. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). Furthermore, appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit." *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000) (quoting *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984)). Accordingly, Petitioner fails to demonstrate either prong of *Strickland*. Because Petitioner does not show that the state appellate court's rejection of this claim was contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts, he is not entitled to relief on Ground Three, sub-claim (C).

Ground Four: "WHETHER TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO PROPERLY QUESTION AND *VOIR DIRE* JUROR WHO WAS EXPOSED TO PRE-TRIAL PUBLICITY AND MEDIA; TO DISCOVER JUROR'S BIAS AND PREJUDICES RESULTING FROM THE SAID PUBLICITY; TO EXCUSE THE JURORS OFF THE JURY; AND TO PRESERVE THIS ISSUE FOR REVIEW IN VIOLATION OF THE SIXTH AMENDMENT? OR; ALTERNATIVELY; WHETHER THE TRIAL COURT'S DECISION INVOLVE [sic] AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS DETERMINED IN STRICKLAND?"

Petitioner asserts that counsel provided ineffective assistance during jury selection. He contends that counsel was ineffective for failing to properly question juror Brian Keller during *voir dire*, for failing to realize Keller's bias and request that he be excused from jury service, and for failing to preserve the issue for appellate review. During *voir dire*, Keller indicated that he had read

or heard something about Petitioner's case.  (Dkt. 12, Ex. 18, Vol. III, at pp. 88-89.)  Accordingly,

the trial court conducted individual *voir dire* with Keller, during which he stated that he saw a

newspaper article concerning the case.  (Dkt. 12, Ex. 18, Vol. IV, at pp. 189-91.)  Keller was selected

to the jury and served as the foreperson.  Petitioner raised this claim of ineffective assistance in his

postconviction motion, which the state court summarily denied:

> In general, "[t]he test for determining juror competency is whether the juror
> can lay aside any bias or prejudice and render his verdict solely upon the evidence
> presented and the instructions on the law given to him by the court."  "It is sufficient
> if a juror can lay aside his opinion or impression and render a verdict based on the
> evidence presented in court."  The Fourth District Court of Appeal has appreciably
> explained the requirements of a claim such as the Defendant's first ground:

>> Because a defendant must demonstrate prejudice in a 3.850
>> proceeding, post-conviction relief based on a lawyer's incompetence
>> with regard to the composition of the jury is reserved for a narrow
>> class of cases where prejudice is apparent from the record, where a
>> biased juror actually served on the jury.... The nature of the juror's
>> bias should be patent from the face of the record.  Only where a
>> juror's bias is so clear can a defendant show the necessary prejudice
>> under *Strickland*.

> As does the Fourth District Court of Appeal, this Court "has great confidence in the
> tendency of jurors to do the right thing after hearing the evidence in a case and being
> instructed on the law from the judge."  Upon review of the record in this case, such
> confidence does not appear to be misplaced.
> As noted previously, "[t]he test for determining juror competency is whether
> the juror can lay aside any bias or prejudice and render his verdict solely upon the
> evidence presented and the law given to him by the court."  The juror in question
> here met that standard, as evidenced by the individual *voir dire* of Juror Keller,
> whose inquiry is excerpted below:

>> THE COURT:      Have a seat in the front row, please, Mr.
>>                 Keller.

>> KELLER:         Certainly.

>> THE COURT:      Good afternoon, sir.  I believe you indicated to
>>                 the lawyers that you may have heard or read

something about this case. Can you tell me what it is that you recall?

KELLER:        It was actually in this morning's paper, I read it in the jury pool room, just a quick synopsis, maybe two paragraphs, gave kind of a brief history of the events.

THE COURT:     And tell me what it is that you recall at this time from reading that article?

KELLER:        Really not that much, to be honest with you. Just struck me when - - and I think it was Mr. Brown that asked anything about the newspaper and that it was in this morning's paper, and I just kind of raised my hand. There was very little detail about it other than Mr. Ware's name, victim's name and address of the nursing home, so not much to it.

THE COURT:     Well, I looked in both papers this morning, I must have missed it. Which paper was it in?

KELLER:        Herald Tribune in the Manatee section, open it up, third page, top right corner talking about two jury trials being set today.

THE COURT:     Obviously we want your verdict to be based on testimony and evidence that you hear in the courtroom rather than what you've read or heard about this case. Do you believe there was anything in that article that would make it difficult for you to be fair and impartial in this case?

KELLER:        No, sir.

THE COURT:     Do you believe that you could assure us that you could set whatever it is that you read in that article about this case aside and render your verdict based solely upon what you hear in this courtroom?

KELLER:          Yes, sir. Again, I don't really remember much about what I read this morning other than again, Mr. Ware's name and the fact that there's two juries for the two high profile or bigger cases were being set today. That's all it was about.

THE COURT:       And in the event that you by some, for some reason do recall a fact or facts from that article, can you assure us that you'll set that information aside and render your verdict just based upon what you hear in this courtroom?

KELLER:          Yes, sir.

Thus, the Defendant has failed to present evidence that Juror Keller would not have rendered his verdict solely upon the evidence presented. Instead, Juror Keller's responses to *voir dire* questioning indicate that he was capable and willing to do just that. In failing to demonstrate any actual juror bias, the Defendant has failed to meet the prejudice prong of the *Strickland* test. Therefore, the Court will deny his motion as to this ground.

(Dkt. 12, Ex. 10, at pp. 5-8) (court's footnotes omitted). The state court's order accurately reflects the exchange between the court and Keller. After the court questioned Keller, neither the prosecutor nor defense counsel asked him any questions about the article or his ability to be impartial. (Dkt. 12, Ex. 18, Vol. IV, at p. 191.)

As the state court found, Petitioner failed to show that he was prejudiced by counsel's performance because there is no evidence that Keller was actually biased. While a criminal defendant is entitled to a trial by an impartial jury, "[i]t is not required ... that the jurors be totally ignorant of the facts and issues involved ... It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961). Therefore, to exclude a member of a jury panel for cause, a party "must demonstrate that the juror in question exhibited actual bias by showing either an express admission

of bias or facts demonstrating such a close connection to the present case that bias must be presumed." *United States v. Chandler*, 996 F.2d 1073, 1102 (11th Cir. 1993). The party challenging the prospective juror has the burden of demonstrating actual bias. *Irvin*, 366 U.S. at 723. Similarly, to be entitled to postconviction relief in state court when claiming that a juror was not impartial, the party must prove bias. "[W]here a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was actually biased." *Carratelli v. State*, 961 So.2d 312, 324 (Fla. 2007).

Accordingly, to establish prejudice, Petitioner must show that Keller was actually biased. Petitioner appears to argue that the mere fact Keller saw a newspaper article demonstrates bias. In further support of his claim, Petitioner argues that the article was more detailed than Keller's description of it, and that it provided information about Petitioner's prior criminal acts and Conwell's petition for protection from domestic violence. However, Petitioner does not show entitlement to relief, even assuming that the article Keller saw contained more information than he described.[21] Keller clearly stated that the information he recalled from the article would not affect his ability to be fair and impartial. Therefore, nothing Keller was able to remember about the article, regardless of the article's precise content, interfered with his ability to serve as an impartial juror. Keller further assured the court that if he happened to remember anything else from the article, he could set that information aside. The record contains no indication that Keller was uncertain or hesitant in his answers. Accordingly, Petitioner establishes no evidence of actual bias. The lack of

---

[21]The trial court noted that an article appeared in the paper the morning of jury selection and a more detailed article was printed the next morning. (Dkt. 12, Ex. 18, Vol. V, at pp. 232-33.)

such evidence prevents a showing of prejudice under *Strickland*.[22]

Lastly, because Petitioner does not show Keller was actually biased, counsel cannot be deemed ineffective for failing to object so as to preserve the issue for appeal.  *See Carratelli*, 961 So.2d at 324.[23]  Accordingly, the state court's finding was not contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts. Petitioner is not entitled to relief on Ground Four.

It is therefore **ORDERED AND ADJUDGED** that Petitioner's petition for writ of habeas corpus (Dkt. 1) is hereby **DENIED**.  The Clerk is directed to enter judgment against Petitioner and close this case.

It is further **ORDERED** that Petitioner is not entitled to a certificate of appealability.  A petitioner does not have absolute entitlement to appeal a district court's denial of his habeas petition. 28 U.S.C. § 2253(c)(1).  A district court must first issue a certificate of appealability (COA).  *Id*. Petitioner is only entitled to a COA if he demonstrates that reasonable jurists would find debatable whether the Court's procedural ruling was correct and whether the § 2254 petition stated "a valid claim of the denial of a constitutional right."  *Id*.; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  To make a substantial showing of the denial of a constitutional right, Petitioner "must demonstrate that

---

[22]Petitioner also contends that it is unclear how many other prospective jurors read the article and that counsel made no attempt to obtain and review a copy of the article.  To the extent he raises these allegations in support of his overall claim that counsel was ineffective, they provide no relief.  Prior to opening statements, the court asked the jury if anyone else had seen a newspaper article that day or the day before, and there is no indication from the record that any juror had.  (Dkt. 12, Ex. 18, Vol. V, at pp. 235-36.)  Petitioner fails to show that any juror was actually biased. Furthermore, Petitioner's speculation or assumptions about the jurors cannot provide federal habeas relief.  *See Tejada. v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (recognizing that vague, conclusory, or unsupported allegations cannot support an ineffective assistance of counsel claim).

[23]Although the state court's order does not expressly rule on Petitioner's claim that counsel was ineffective for not preserving the issue for appeal, the state court recognized this claim (*see* Dkt. 12, Ex. 10, at p. 5) and is presumed to have resolved it on the merits "in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 131 S.Ct. at 784-85.

reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack*, 529 U.S. at 484, or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Petitioner cannot make the requisite showing because he has not demonstrated that reasonable jurists would find debatable whether the procedural determination that his claims were procedurally defaulted was correct, or whether the petition stated a substantial denial of a constitutional right. Because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on ___February 24___, 2015.


_____
**JAMES D. WHITTEMORE**
**United States District Judge**



<u>Copy to:</u>
*Pro se* Petitioner
Counsel of record

SA:ml